Sabrina **BECERRA**, a minor, Natural Dependent Daughter and Legal Heir of Aaron M. Becerra, Deceased, by and through her Natural Mother, Legal Guardian and Next Friend, Angela **PEREZ**, et al., Plaintiffs,

v.

**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY,** Kansas, et al., Defendants.

No. 02–2492 DJW.

United States District Court, D. Kansas.

Sept. 30, 2004.

Daniel J. Cohen, The Lakin Law Firm, Wood River, IL, Davy C. Walker, Kansas City, KS, for Plaintiffs.

Michael W. Shunk, McCormick, Adam & Long, P.A., Overland Park, KS, for Defendants.

## MEMORANDUM AND ORDER

WAXSE, United States Magistrate Judge.

This is a lawsuit to recover for personal injuries and wrongful death arising out of a collision between a fire truck and a private automobile. Defendants' Motion for Summary Judgment (doc. 105) is ready for decision and, for the reasons below, the Motion is granted in part and denied in part.

## I. *Facts*

The following facts are either uncontroverted or presented in the light most favorable to Plaintiffs, the nonmoving parties:

### A. The Collision

Anthony Mots ("Mots") is employed as a firefighter with the Kansas City, Kansas Fire Department, a division of the Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government"). In the course of responding to an emergency call on September 30, 2000, Mots—who was driving a fire truck westbound on Central Avenue—struck a vehicle being driven southbound on 18th Street by Aaron Becerra ("Becerra"). Becerra subsequently died as a result of the injuries he sustained in this accident.

Mots activated emergency lights and sirens on the fire truck when he left the fire station. Mots acknowledges there were no traffic signals restricting westbound Central Avenue traffic at 15th, 16th or 17th Streets and concedes he may have been able to see the 18th Street/Central Avenue traffic light governing his westbound direction of travel on Central Avenue as early as 14th Street.

There is a dispute between the parties regarding the color of the traffic signal at the time Mots drove through the 18th Street/Central Avenue intersection: Plaintiffs allege the traffic light was red as Mots approached and drove through the intersection. Defendants maintain the 18th Street light was red as Mots traveled on westbound Central through the intersections at 15th, 16th and 17th Streets, but that the 18th Street light turned green for westbound traffic on Central at some point during the time Mots was traveling from 17th to 18th Street. For purposes of ruling on the pending Motion for Summary Judgment, the Court views the facts in the light most favorable to Plaintiffs; thus, the Court deems Mots to have run a red light prior to the collision.

Although neither Mots nor the supervisory captain riding in the seat next to Mots know the rate of speed at which the fire truck was traveling between 14th Street and the 18th Street/Central Avenue intersection, Mots believes he had an adequate opportunity to appraise the roadway ahead of him—including the intersection, traffic and traffic lights—and decide how he was going to navigate through the traffic as he approached the intersection.

Central Avenue and 18th Street meet in a five-way intersection with a building on the northeast corner. This building can blanket and/or ricochet the sirens and horns of an emergency vehicle and also can blanket or block the line of sight to the lights of an emergency vehicle.

The emergency lights and sirens were operating and Mots sounded the air horn as the fire truck approached the 18th Street/Central Avenue traffic signal. Due to the position of other vehicles heading westbound in front of him and stopped for the red light, Mots moved the fire truck

from the westbound lane of traffic into the eastbound lane for oncoming traffic and subsequently entered the intersection in that lane. Even though the light was red, Mots did not stop the fire truck at the traffic light and accelerated to increase the speed of the fire truck as he entered the intersection. Although, again, neither Mots nor the supervisory captain riding in the seat next to Mots know the rate of speed at which the fire truck was traveling prior to the collision, Plaintiffs' accident reconstruction expert calculates a speed of 23–24 miles per hour at impact.

Although Mots did not see the Becerra vehicle until a split second before the collision, eyewitness Kenneth Lee, who was stopped at the red light on westbound Central Avenue at 18th Street as the fire truck went around him, was able to see Becerra's vehicle as Becerra approached and entered the intersection on southbound 18th Street.

## B. Fire Department Written Training Materials

The emergency vehicle operators' training materials used by the Unified Government to train Kansas City, Kansas fire department drivers include materials from the International Fire Service Training Association ("IFSTA"). The IFSTA manuals are maintained in fire station libraries and at the fire department library in order to provide training opportunities for fire department employees. The fire department's goal in making IFSTA emergency vehicle training materials available to its drivers is to ensure that an emergency vehicle is operated safely, and that the vehicle arrives safely at its destination. When a fire department employee seeks a promotion to the position of driver, the employee must pass a test consisting of questions derived from IFSTA materials. Emergency vehicle drivers should, therefore, know the basic concepts of emergency driving as outlined in the materials

made available to them, which include the IFSTA books.

## C. Fire Department Policies, Practices and Training Regarding Travel Route, Travel Speed and Traveling Through Intersections

### 1. *Travel Route*

#### a. *Testimony of Anthony Mots*

When a dispatcher transmits an emergency fire call to the fire station, Mots—as the driver of the fire truck—first ascertains the site location and determines a travel route to reach the site. Mots then gets in the fire truck, pulls out on the roadway and begins traveling his predetermined route. Mots always travels the most direct route when responding to an emergency fire call.

Mots acknowledges that buildings at an intersection can blanket or redirect siren noise, and thereby increase the potential for a collision. Mots also acknowledges that a busy and congested intersection is more prone to collisions involving emergency vehicles, and that the more roadways there are at an intersection, the higher the risk for collision. Nevertheless, even assuming that the features of the intersection make it more dangerous than another intersection, Mots always travels the most direct route when responding to an emergency fire call and does not change his chosen route to avoid an intersection that he believes is more hazardous.

#### b. *Testimony of Fire Chief Thomas DeKeyser*

Thomas DeKeyser has been the Chief of the Kansas City, Kansas Fire Department since 1996, and his duties include general leadership and development of policies and procedures, including general orders, special orders, bulletins, memorandums, standard operating guidelines and rules of con-

duct. It is DeKeyser's job to interpret and define the meaning of a department policy if such a policy comes into question. In selecting a travel route to a fire emergency, DeKeyser deems speed of response as the paramount consideration.

### c. Testimony of Captain Stephen

In choosing the route to a fire emergency, Captain Stephen, who is Mots' supervisory captain and was seated to Mots' right at the time of the collision, will not avoid an intersection because the intersection, due to congestion, traffic count, nature of signals, nature of road layout, or the presence of building structures, is more risky. To the contrary, he will go through that intersection: "[c]losest route is what we like to go."

### d. Training Materials

In selecting a proper response route, IFSTA emergency vehicle operators' training materials used by the Unified Government to train Kansas City, Kansas fire department drivers instruct that the most direct route may not be appropriate; traffic, population and the hazardousness of the intersection are factors to be considered in deciding upon a route. The materials also note the importance of arriving safely at the destination of the fire.

### 2. Travel Speed

#### a. General Order 96

General Order 96, the Unified Government's written policy regarding operation of emergency response vehicles, prohibits driving too fast for existing conditions and specifically prohibits drivers from exceeding the posted speed limit at any intersection.

#### b. Written Training Materials

Defendants' written training materials stress that safely arriving at the destination of the fire is more important that speedily arriving there.

### c. Testimony of Anthony Mots

In responding to an emergency fire call, Mots decides what speed he believes is appropriate given the road conditions, the traffic and the traffic signals. In deciding at what speed he will travel, Mots considers the time it would take to react to existing roadway conditions.

### d. Testimony of Fire Chief DeKeyser

Although it would violate that portion of General Order 96 prohibiting drivers to exceed the posted speed limit at any intersection, DeKeyser is unwilling to embrace the suggestion that a speed of 50 miles per hour by Mots under the specific circumstances presented (a posted speed limit of 30 miles per hour through a red light at a five-way intersection with buildings potentially obstructing sight and sound) would have been inappropriate.

### 3. Slowing Down vs. Stopping Before Traveling Through Negative Right–if–Way Intersections

#### a. General Order 96

General Order 96 provides, among other things, that an emergency response vehicle approaching a negative right-of-way intersection shall slow down and prepare to stop. General Order 96 also instructs that, in such a situation, the emergency vehicle may proceed only when the driver can account for all oncoming traffic, in all lanes, and can verify that such oncoming traffic is yielding the right-of-way.

#### b. Written Training Materials

Specific directives within IFSTA training materials utilized by the Kansas City, Kansas Fire Department instruct that a driver/operator should stop before enter-

ing a negative right-of-way intersection, even if local policies or state statutes permit travel against a red light or stop sign.

### c. Driver Training

Steven Jensen is a Kansas Highway Patrol Officer who provided some of the driver training to the Unified Government's fire department, including Mots. The training he provided does not recommend that emergency vehicles be brought to a stop before entering a negative right-of-way intersection. As opposed to a general rule requiring a driver to stop at every intersection in emergency responses, Jensen instructs drivers to duly regard the safety of others by scanning the intersection upon approach and then proceeding through such intersection only after verifying it is clear.

Jensen believes Mots' driving on the day in question was reasonable under the circumstances and would deem Mots' driving to be "out of control" on that day only if

— Mots traveled at an unreasonable speed upon approach to the intersection, and

— Mots incorrectly scanned the intersection prior to and upon entering it by failing to take into account every situation that could exist dealing with factors such as the light, weather, road, traffic and pedestrians.

### d. Testimony of Anthony Mots

Mots usually does not stop before entering a negative right-of-way intersection, and Mots did not bring the fire truck to a stop before entering the intersection at issue here.

### e. Testimony of Fire Chief DeKeyser

Fire Chief DeKeyser acknowledges training materials that direct a driver to stop before entering a negative right-of-way intersection may contradict General Order 96, the Fire Department's official policy. According to DeKeyser, drivers should follow the department's official policy, which requires a driver to slow down, prepare to stop and proceed only when the driver can account for all oncoming traffic, in all lanes, and verify that such oncoming traffic is yielding the right-of-way. DeKeyser has never communicated to any of his drivers to stop for red lights, and he is not aware of anyone ever having made that communication.

### II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue of material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] A fact is "material" if it is "essential to the proper disposition of the claim" and an issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[3]

The moving party bears the initial burden of demonstrating absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[4] In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need

---

1. Fed.R.Civ.P. 56(c).

2. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

3. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

4. *Id.* at 670–71.

simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[5]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[6] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[7] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[8] Although summary judgment is often appropriate to secure the just, speedy and inexpensive determination of a particular case without the need for trial, deeply rooted principles of justice require that issues of fact be presented to a jury for determination and "the right to have such questions decided by a jury is of constitutional status."[9]

### III. *Discussion*

Plaintiffs' cause of action is set forth in four separate counts. Count I is a state law wrongful death claim brought pursuant to the Kansas Tort Claims Act. Except for limited issues related to standing, Defendants do not move for judgment on the state law claim; thus, notwithstanding any ruling here, the wrongful death cause of action brought pursuant to the Kansas Tort Claims Act is set to go forward to jury trial.

In Counts II, III, and IV, Plaintiffs claim Defendants are liable under 42 U.S.C. § 1983 for violating Becerra's substantive due process rights. Defendants argue they are entitled to judgment as a matter of law on all three of these section 1983 claims:

- Count II, alleging that Mots' operation of the fire truck violated Becerra's substantive due process rights;
- Count III, alleging that Mots' operation of the fire truck conformed to an official policy or established custom of the Unified Government, which violated Becerra's substantive due process rights; and
- Count IV, alleging that Mots' operation of the fire truck was attributable to inadequate training and/or supervision on the part of the Unified Government, which violated Becerra's substantive due process rights.

Defendants further argue they are entitled to judgment as a matter of law on:

- the claims of Hector Becerra in any capacity under the Kansas Wrongful Death Act, because he lacks standing to make such a claim;
- the claims of Sabrina Becerra and Hector Becerra (in his individual capacity only) under the Kansas statute for survival of claims, because they lack standing to bring such a claim; and
- the claims of Sabrina Becerra and Hector Becerra (in his individual capacity only) under 42 U.S.C. § 1983, because they lack standing to bring such a claim.

In responsive briefing, Plaintiffs concede the standing issues raised in Defendants' Motion and agree (1) that Sabrina Becerra is the only party with standing to pursue the wrongful death claims under Kansas law in Count One; (2) that Hector Becerra, in his capacity as Personal Representa-

---

**5.** *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**6.** *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

**7.** *Adler,* 144 F.3d at 671.

**8.** *Id.*

**9.** *Meeker v. Rizley,* 346 F.2d 521, 525 (10th Cir.1965).

tive on behalf of Aaron Becerra, is the only party with standing to pursue the survival claims under Kansas law in Count One; and (3) that Hector Becerra, in his capacity as Administrator of Aaron Becerra's Estate, is the only party with standing to pursue the federal claims in Counts II, III, and IV.

Given Plaintiffs' response to Defendants' arguments, Defendants' Motion for Summary Judgment due to lack of standing will be summarily granted as unopposed. Accordingly, the Court hereby grants judgment as a matter of law in favor of Defendants on

(1) the claims of Hector Becerra under the Kansas Wrongful Death Act;

(2) the claims of Sabrina and Hector Becerra (in his individual capacity only) under the Kansas statute for survival of claims; and

(3) the claims of Sabrina Becerra and Hector Becerra (in his individual capacity only) under 42 U.S.C. § 1983.

The remaining issues presented for the Court's determination are whether Defendants are entitled to judgment as a matter of law on the section 1983 claims against Mots in his individual capacity and against the Unified Government as an entity.

## A. Fourteenth Amendment Claim Against Individual Defendant Mots

Plaintiffs allege Mots violated Becerra's Fourteenth Amendment right to substantive due process of law by creating a dangerous situation that resulted in Becerra's death, thus depriving him of his life without due process of law. To establish a

section 1983 substantive due process claim, Plaintiffs allege Mots' conduct "shocks the conscience."

Defendants maintain that Plaintiffs cannot establish a viable substantive due process claim because Mots' conduct does not rise to a level that "shocks the conscience" as required to support a section 1983 cause of action. Defendants further contend that even if Plaintiffs could establish Mots' conduct rises to a level that shocks the conscience, Mots is shielded from liability by the doctrine of qualified immunity.

### 1. Substantive Due Process Violation

The Due Process Clause provides that the government may not "deprive any person of life, liberty or property, without due process of law."[10] Not every right or interest is entitled to protection under the substantive Due Process Clause.[11] Rather, a substantive due process claim is "founded upon deeply rooted notions of fundamental personal interests derived from [the] Constitution."[12] The standard for judging a substantive due process claim is whether the challenged government action "shocks the conscience."[13]

### a. The "Shocks the Conscience" Standard

■ To satisfy this "shocks the conscience" standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."[14] Instead, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shock-

---

**10.** U.S. Const. amend. XIV.

**11.** *Archuleta v. Colorado Dep't of Inst., Div. of Youth Servs.,* 936 F.2d 483, 489 n. 6 (10th Cir.1991).

**12.** *Hennigh v. City of Shawnee,* 155 F.3d 1249, 1256 (10th Cir.1998).

**13.** *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 528 (10th Cir.1998).

**14.** *Id.*

ing."[15] In determining the level of fault necessary to shock the conscience, the United States Supreme Court case of *County of Sacramento v. Lewis*[16] is instructive. The issue presented for decision in *Lewis* was whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in the context of a high-speed automobile chase, a chase aimed at apprehending a suspected offender. In *Lewis*, the defendant officer, driving a patrol car, pursued a motorcycle through a residential neighborhood for 75 seconds at speeds up to 100 miles per hour, covering a distance of 1.3 miles. The chase ended after the motorcycle fell over while turning. The patrol car struck the motorcycle passenger, killing him. The victim's family brought a section 1983 claim against the officer, the county, and the sheriff's office, alleging a substantive due process deprivation.

The Supreme Court held that under the specific facts presented, deliberate or recklessly indifferent conduct did not "shock the conscience" and therefore was insufficient to state a substantive due process claim. More specifically, the Court held that in light of the unforeseen circumstances demanding the officer's instant judgment, a demonstration of actual purpose to cause harm was necessary to establish liability.[17]

### b. Level of Fault Necessary to Shock the Conscience in this Case: "Deliberate Indifference" or "Purpose to Cause Harm"?

■ The level of fault necessary to "shock the conscience" must be deter-

mined on a case-by-case basis and cannot be determined without first considering the immediate circumstances confronting the state actor.[18] A significant part of the Supreme Court's holding in *Lewis* is the proposition that where there is time for deliberation prior to acting, the level of fault for liability is reckless or deliberate indifference.[19] Where circumstances necessitate split second judgments, the standard of fault for liability is higher: an actual purpose to cause harm.[20]

Relying upon *Lewis*, Defendants allege Plaintiffs fail to present sufficient facts to support a finding that Mots had time to deliberate prior to the accident. Defendants contend that without facts to demonstrate Mots had time for deliberation before the collision, Plaintiffs must establish Mots had a "purpose to cause harm"—as opposed to engaging in conduct that was "deliberately indifferent"—in order to prevail on their theory that Mots' conduct shocks the conscience. Based on this rationale, and the fact that Plaintiffs have never alleged Mots had a purpose to cause harm, Defendants argue they are entitled to judgment as a matter of law.

Plaintiffs strenuously disagree with Defendants' underlying contention, arguing the evidence presented in conjunction with the motion for summary judgment establishes a genuine issue of material fact for trial regarding whether Mots had time for deliberation prior to the accident. For the following reasons, the Court agrees.

### c. Adequate Time and Opportunity to Deliberate Prior to Acting

■ In *Lewis*, the United States Supreme Court held that a state actor's lia-

---

15. *Id.*

16. 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

17. *Id.* at 853, 118 S.Ct. 1708.

18. *Id.*

19. *Id.*

20. *Id.*

bility for deliberate indifference turns upon the opportunity for deliberation by that state actor prior to engaging in the conduct at issue: "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." [21] Notably, the Court explained that its use of the word "deliberation" in this context should not be construed in a narrow, technical sense: "deliberation here does not mean that the man slayer must ponder over the killing for a long time; rather, it may exist and may be entertained while the man slayer is pressing the trigger of the pistol that fired the fatal shot, even if it be only for a moment or instant of time." [22]

Against this legal backdrop, and viewing the evidence in the light most favorable to Plaintiffs, the following facts persuade the Court that a genuine issue of material fact exists with respect to whether Mots had time for deliberation prior to the accident:

Upon receiving the emergency call on September 30, 2000, Mots first ascertained the location of the house fire and determined the most direct route to reach the site. Mots then got in the fire truck, pulled out on the roadway and began traveling his predetermined route. Mots activated emergency lights and sirens on the fire truck when he left the fire station.

As Mots traveled west on Central Avenue, there were no traffic signals impeding his progress at the 15th, 16th or 17th Street intersections. Mots may have been able to see the 18th Street/Central Avenue traffic light governing his westbound direction of travel on Central Avenue as

early as 14th Street. Regardless, Mots believes he had an adequate opportunity to appraise the roadway ahead of him—including the 18th Street intersection, traffic and traffic lights—and decide how he was going to navigate the intersection. Neither Mots nor the supervisory captain riding along with Mots know the rate of speed at which the fire truck was traveling between 14th Street and the 18th Street/Central Avenue intersection.

The emergency lights and sirens continued to operate and Mots sounded the air horn as the fire truck approached the 18th Street/Central Avenue traffic signal. As he approached the red light, Mots moved the fire truck from the westbound lane of traffic into the eastbound lane for oncoming traffic and entered the intersection in that lane. Although Mots had a red light, he did not stop the fire truck before entering the 18th Street intersection and accelerated the speed of the fire truck as he entered the intersection. Mots did not see the Becerra vehicle until a split second before the collision. Eyewitness Kenneth Lee, who was stopped at the red light on westbound Central Avenue at 18th Street as the fire truck went around him, was able to see Becerra's vehicle as Becerra approached and entered the intersection on southbound 18th Street.

Central Avenue and 18th Street meet in a congested five-way intersection, including a building located on the northeast corner. Mots acknowledges that the more roadways that intersect, the more prone the intersection is to collisions. The building located on the northeast corner of the intersection obstructed and/or interfered

---

**21.** *Id.* ("When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."); *see, also, Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir.1998), *cert. denied*, 525 U.S. 1103, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999) (holding that when the state actor has the opportunity to deliberate about the decisions

he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience).

**22.** *Lewis*, 523 U.S. at 851, n. 11, 118 S.Ct. 1708 (citation omitted).

with Mots view of the Becerra vehicle and potentially blanketed and/or redirected siren noise from Mots' fire truck. Notwithstanding prior knowledge of these circumstances, Mots would not change his chosen route to avoid such an intersection.

General Order 96, the Unified Government's written policy regarding operation of emergency response vehicles, provides that an emergency response vehicle approaching a negative right-of-way intersection shall slow down and prepare to stop. General Order 96 goes on to instruct that in such a situation, the emergency vehicle may proceed only when the driver can account for all oncoming traffic, in all lanes, and verify that such oncoming traffic is yielding the right-of-way. Specific directives contained within the Unified Government's training materials instruct that a driver/operator should stop before entering a negative right-of-way intersection, even if local policies or state statutes permit travel against a red light or stop sign.

Steven Jensen, the Highway Patrol Officer providing training to fire department drivers, instructs drivers to duly regard the safety of others by scanning each intersection upon approach and proceeding through such intersection only after verifying it is clear. Fire Chief DeKeyser requires fire department drivers to comply with General Order 96, compelling a driver to slow down, prepare to stop and proceed only when the driver can account for all oncoming traffic, in all lanes, and verify that such oncoming traffic is yielding the right-of-way.

Plaintiffs' accident reconstruction expert calculate the speed of the fire truck at impact (after acceleration by Mots) to be 23–24 miles per hour. General Order 96, the Unified Government's written policy

regarding operation of emergency response vehicles, prohibits driving too fast for existing conditions and specifically prohibits drivers from exceeding the posted speed limit at any intersection.

The Court is persuaded that the evidence presented above creates a material issue of fact regarding how much time Mots had to deliberate before the fatal collision. For example, Mots testifies he *may* have seen the 18th Street/Central Avenue traffic signal from four blocks away. In reviewing Mots' testimony in the context of the question posed at the deposition, the Court finds use of the word "may" by Mots in his testimony regarding whether he saw the 18th Street/Central Avenue traffic signal from four blocks away leaves open the possibility in Mots' mind that he *may not* have seen the traffic signal from four blocks away. Mots' hesitation in this regard interjects several critical questions of fact with respect to whether Mots had an opportunity to deliberate before the fatal crash:

- how far away was Mots from the intersection and traffic signal before seeing and/or appraising the traffic?
- at what speed was Mots traveling as he drove from 14th Street to 18th Street?
- how much time did Mots have to deliberate while he drove this distance?

Given Mots' uncertainty regarding where he was when he first was able to assess the 18th Street intersection, and the lack of information regarding the speed of the truck from 14th Street to 18th Street, the Court cannot determine as a matter of law how much time Mots had to deliberate while he drove from 14th Street to 18th Street. For example, if a jury believes the fire truck was traveling at a speed of 30 miles per hour [23] in the four blocks [24] from

**23.** The speed limit on Central Avenue from the 14th Street intersection to the 18th Street intersection is 30 miles per hour. General

Order 96, the Unified Government's written policy regarding operation of emergency re-

the 14th Street intersection to the 18th Street intersection, Mots would have had approximately 34 seconds to assess the 18th Street intersection prior to reaching it. If a jury believes the fire truck was traveling at a speed of 20 miles per hour [25] from the 14th Street intersection to the 18th Street intersection, Mots would have had approximately 50 seconds to assess the 18th Street intersection prior to reaching it.

Assuming the jury ultimately determines one or another particular combination of factual variables is credible, the next question of fact becomes whether the resulting time period (e.g., a range of time from approximately 34 seconds to approximately 50 seconds based on the assumptions above) constitutes a reasonable opportunity to deliberate under the circumstances.

Also creating a question of material fact regarding whether Mots had an opportunity for deliberation is testimony from Mots that he did not see the Becerra vehicle until a split second before the collision—testimony that directly contradicts Mots' own testimony that he had adequate opportunity to appraise the traffic at the intersection as he was approaching it. That Mots did not see the Becerra vehicle until a split second before the collision also contradicts the testimony of eyewitness driver Kenneth Lee, who was stopped at the red light on westbound Central Avenue at 18th Street as the fire truck went around him to proceed into the intersection. Lee was able to see the Becerra vehicle as it approached and entered the intersection on southbound 18th Street.

At this juncture, the Court finds it helpful to compare the factual circumstances in this case with the factual circumstances presented in *Lewis*.[26] In *Lewis*, the defendant officer, driving a patrol car, pursued a motorcycle through a residential neighborhood at speeds up to 100 miles per hour. The defendant officer did not choose the route he traveled, the speed at which traveled or whether to observe traffic signs and signals. The officer did not have an opportunity to appraise the roadway ahead of him and did not have an opportunity to decide how he was going to navigate through the traffic. In applying the higher "purpose to cause harm" standard to establish conscience shocking conduct, the *Lewis* court found that the undisputed facts established—as a matter of law— circumstances demanding the officer's instant judgment and were not circumstances where the officer had time for deliberation.

The facts presented here differ significantly from the facts in *Lewis*. Mots predetermined the route he would travel to reach the destination site. Mots chose the speed at which he traveled and, in so

sponse vehicles, prohibits drivers from exceeding the posted speed limit at any intersection.

24. Assuming the distance from 14th and Central Avenue to 18th and Central Avenue is .28 miles. See http://www.mapquest.com/directions/main.adp?do=prtmo=ma&un=m&go=1&1a=S%2014th%20St%20%26%20Central%20Ave&1c=Kansas%20City&1g=XyiMvRZpEHg%3D&2a=S%2018th%20St%20%26%20Central%20Ave&2tabval=address&1l=J1HRHh2aZbI%3D

&2c=Kansas%20City&1n=WYANDOTTE%20COUNTY&cl=EN&2g=c%2BWnchCG0%2Fo%3D&1s=KS&21=Upr1PjgiHng%3D&ct=NA&1v=INTERSECTION&2n=WYANDOTTE%20COUNTY&1y=US&1tabval=address&1z=66102&2s=KS&2v=INTERSECTION&did=1096569855&2y=US&2z=66102.

25. Assuming Mots accelerated just prior to impact, at which time he was traveling at approximately 23 miles per hour.

26. 523 U.S. at 836, 118 S.Ct. 1708.

choosing, considered the road conditions, the traffic and the traffic signals. As Mots approached the intersection, he had an adequate opportunity to appraise the roadway ahead of him—including the intersection, traffic and traffic lights—and decide how he was going to navigate through the traffic. As noted above, a reasonable jury could believe Mots had as much as 34 to 50 seconds to assess the upcoming 18th Street intersection. Finally, although officers involved in suspect pursuits may be required to violate traffic laws or risk losing the suspect, Mots was not in danger of losing a suspect. Defendants' training materials stress that safely arriving at the destination of the fire is more important than speedily arriving there.

Applying the principles of *Lewis,* and viewing the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs, the Court finds a genuine issue of material fact exists with respect to whether Mots had the opportunity for deliberation prior to the fatal accident. In other words, given the number of critical facts that are either unknown or in dispute in this particular case, it is within the sole province of the jury to resolve the factual dispute regarding whether Mots had an opportunity to deliberate and, thus, whether the level of fault necessary to shock the conscience is "deliberate indifference" or "purpose to cause harm." Through this holding, the Court does not intend to suggest that in the context of a substantive due process claim, the factual issue of whether a state actor has an opportunity to deliberate may never be decided as a matter of law. Rather, this holding is limited to the unique circumstances of this case, circumstances that present for consideration a number of unknown and disputed facts that are critical to a determination regarding opportunity to deliberate.

Based on the existence of a genuine issue of material fact as described above, Mots is not entitled to summary judgment on Count II of Plaintiffs' Complaint. Thus, the factual issue regarding whether Mots had an opportunity to deliberate prior to the fatal accident must go forward to trial for determination by a jury. If a jury determines Mots had an opportunity to deliberate and, accordingly, that the level of fault necessary to shock the conscience is deliberate indifference, the jury then must go on to determine whether the facts establish Mots was deliberately indifferent to the Becerra's rights. On the other hand, if a jury determines Mots did not have an opportunity to deliberate and, accordingly, that the level of fault necessary to shock the conscience is purpose to cause harm, the jury necessarily must reject a finding of liability on behalf of Mots on grounds that Plaintiffs have never alleged Mots had a purpose to cause harm.

### 2. Qualified Immunity

■ Given the Court's finding that a factual issue exists regarding whether Mots, as a state actor, violated Becerra's Fourteenth Amendment right to substantive due process of law, the next question is whether Mots nevertheless is entitled to qualified immunity on Plaintiffs' claim.

### a. Standards for Qualified Immunity

■ Qualified immunity is available to state actors who perform discretionary functions if their actions do not violate clearly established law of which a reasonable person would have known.[27] The two-part framework for analyzing claims of qualified immunity on summary judgment is well settled. "Once a defendant pleads qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or

27. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

statutory right and (2) demonstrating that the right violated was clearly established at the time of the conduct at issue."[28] Only after determining on summary judgment that the plaintiff has come forward with sufficient evidence to find deprivation of a constitutional right does the court ask whether the right allegedly violated was clearly established at the time of the conduct at issue.[29]

As set forth above, the Court finds Plaintiffs have submitted sufficient facts from which a finder of fact could determine that Mots violated Becerra's Fourteenth Amendment right to substantive due process of law. Accordingly, Plaintiffs have satisfied the first prong of the qualified immunity analysis. Turning to the second prong, the Court next considers whether, at the time that the relevant conduct occurred, the right allegedly violated was clearly established.

#### b. Clearly Established Right

■ Plaintiffs allege the right at issue in this case is the right to be free from deliberate indifference by a state actor towards an obvious risk of harm under circumstances where deliberation by the state actor prior to acting was practical. In order to find this right was clearly established at the time of the conduct at issue, "[t]he contours of the right must [have been] sufficiently clear [so] that a reasonable official would [have understood] that what he [was] doing violate[d] that right."[30] Requiring the law to be "clearly established" before a waiver of qualified immunity may be found "insure[s] that officials may reasonably anticipate when their actions might give rise to liability for damages."[31]

In light of that purpose, "it is the plaintiff's burden to establish the asserted right's contours are sufficiently clear such that a 'reasonable official would understand that what he is doing violates that right.'"[32] As a general rule, to satisfy this burden, "a plaintiff must establish that there is a Supreme Court or Tenth Circuit opinion on point, or that the clearly established weight of authority from other courts has held the law to be as the plaintiff maintains."[33]

That a plaintiff is unable to refer the court to an opinion that precisely matches the facts of his or her grievance is not necessarily fatal to the claim.[34] Instead, "where the reasonableness inquiry necessarily turns on the cases' particular facts such that the reasonableness determination must be made on an *ad hoc* basis, we must allow some degree of generality in the contours of the constitutional right at issue."[35] Accordingly, the Tenth Circuit "require[s] 'some but not precise factual correspondence' between the cases cited and the factual situation in the case at hand."[36] Were they to hold otherwise,

---

**28.** *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir.1998) (citing *Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir.1997)).

**29.** *Baptiste*, 147 F.3d at 1255 n. 6 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

**30.** *Baptiste v. J.C. Penney Co.*, 147 F.3d at 1255 (citing *Anderson v. Creighton*, 483 U.S. 635, 640–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir.1995)).

**31.** *Clanton v. Cooper*, 129 F.3d 1147, 1156 (10th Cir.1997).

**32.** *Lawmaster v. Ward*, 125 F.3d 1341, 1350 (10th Cir.1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

**33.** *Clanton*, 129 F.3d at 1156.

**34.** *Id.* (citation omitted).

**35.** *Lawmaster*, 125 F.3d at 1351.

**36.** *Horstkoetter v. Dep't of Public Safety*, 159 F.3d 1265, 1278 (10th Cir.1998) (citation omitted).

courts "would be placing an impracticable burden on plaintiffs if [they] required them to cite a factually identical case before determining they showed the law was 'clearly established' and cleared the qualified immunity hurdle." [37]

To that end, the Court believes that in September of 2000, the United States Supreme Court's holding in *Lewis* [38] was sufficiently clear to inform Mots that if he acted with deliberate indifference towards an obvious risk of harm to Becerra under circumstances where deliberation prior to acting was practical, it would violate Becerra's constitutional rights. As noted earlier in this opinion, the Court readily acknowledges the facts in *Lewis* do not mirror the facts posed to the Court in this case.

Although the facts presented here and the facts in *Lewis* are critically different regarding determination of whether the state actor had an opportunity to deliberate, the Supreme Court established legal precedent in *Lewis* regarding the level of fault necessary to prove a substantive due process violation under circumstances where the state actor had an opportunity to deliberate and under circumstances where the state actor did not have an opportunity to deliberate. By elucidating what conduct does not rise to the level of a constitutional grievance, the Supreme Court necessarily illuminated what conduct may in fact constitute a substantive due process violation and, therefore, provided guidance for determining the contours of the right. More specifically, the *Lewis* Court recognized the existence of a substantive due process violation based on deliberate indifference where, although there is an opportunity to deliberate prior

to acting, defendants nevertheless take action in conscious and unreasonable disregard of the consequences.

Based on Plaintiffs' version of the facts and controlling Supreme Court law at the time the conduct occurred, the Court believes that a reasonable fire truck driver, if placed in the position of Mots in this case, would have understood that, under circumstances where prior deliberation was practical, acting with deliberate indifference towards an obvious risk of harm to Becerra under circumstances would violate Becerra's constitutional rights. For this reason, the Court concludes that Mots' request for judgment on the basis of qualified immunity must be denied.

## B. Fourteenth Amendment Claims Against the Unified Government

■ When a section 1983 claim is asserted against a municipality, the Court examines first whether the actions of the government employee constitute a violation of the plaintiff's constitutional rights and, if so, whether the city is responsible for that violation.[39] With regard to the first component, the Court already has found that Plaintiffs have come forward with sufficient facts to establish that Mots' actions may have violated a federal constitutional right. Thus, the question now is whether Plaintiffs have come forward with sufficient evidence to demonstrate that the Unified Government is responsible for Mots' alleged violation.

### 1. *Municipal Liability Based on Official Policy or Established Custom*

■ In order for a municipality to be held liable under section 1983, a plaintiff

---

**37.** *Clanton*, 129 F.3d at 1156 (citation omitted).

**38.** 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

**39.** *Trigalet v. City of Tulsa, Oklahoma*, 239 F.3d 1150, 1155 (10th Cir.2001).

must prove that a municipal policy or custom caused the plaintiff's alleged deprivation.[40] To that end, the Tenth Circuit Court of Appeals requires a plaintiff to satisfy each prong of the following three-part test in order to hold a municipality liable in a section 1983 suit: (1) the existence of a custom or practice of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and (3) injury to the plaintiff by virtue of the unconstitutional acts pursuant to the municipality's custom, as well as proof that the custom was the moving force behind the unconstitutional acts."[41]

#### a. *Existence of Official Policy or Established Custom*

 The Unified Government may be held liable for violations of civil rights under section 1983 only if such violations result from the "execution of a government's policy or custom."[42] Thus, where there is no evidence that an employee's actions are consistent with an official policy or custom of the municipal employer, summary judgment is warranted.[43] An unconstitutional policy or custom need not be formal or written to create municipal liability.[44] A municipal custom or policy may be established through an officially promulgated policy, a custom or persistent practice, deliberately indifferent training

that results in the violation of a plaintiff's federally protected rights, or a single decision by an official with final decision-making authority.[45]

Plaintiffs contend the following Unified Government policies and/or customs resulted in the constitutional deprivations alleged:

- A policy and/or custom of unnecessary and excessive speed under less than optimal traffic conditions in operating emergency response vehicles.

- A policy and/or custom requiring that an emergency response vehicle approaching a negative right-of-way intersection need only slow down and prepare to stop.

- A policy and/or custom of selecting emergency response routes using only one criteria: the most direct route.

The Court will examine whether Plaintiff has shown a material question of fact regarding the existence of each of the alleged policies and customs.

#### i. *Policy and/or Custom of Operating Emergency Response Vehicles Under Less Than Optimal Traffic Conditions at Unnecessary and Excessive Speeds*

Defendants assert it is neither the policy nor the custom of the Unified Government to operate emergency response vehicles under less than optimal traffic conditions

---

**40.** *Bd. of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

**41.** *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cty., Kan.* 996 F.2d 1035, 1041 (10th Cir.1993); *Stewart v. Bd. of Comm'rs for Shawnee County, Kan.,* 320 F.Supp.2d 1143, 1151 (D.Kan.2004).

**42.** *Faustin v. City, County of Denver, Colorado,* 268 F.3d 942, 951 (10th Cir.2001) (citing *Monell v. Dep't of Soc. Serv. of the City of New*

York, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

**43.** *Harris v. Robinson,* 273 F.3d 927, 932 (10th Cir.2001) (citing *Monell,* 436 U.S. at 690–94, 98 S.Ct. 2018).

**44.** *Watson v. City of Kansas City, Kan.,* 857 F.2d 690, 695 (10th Cir.1988).

**45.** *Smith v. Barber,* 195 F.Supp.2d 1264, 1271, n. 2 (D.Kan.2002).

at unnecessary and excessive speeds. To support their assertion, Defendants cite to General Order 96, the Unified Government's written policy regarding operation of emergency response vehicles, which specifically prohibits driving too fast for existing conditions.

Plaintiffs concede that General Order 96 on its face prohibits driving too fast under existing conditions. Plaintiffs argue, however, that the formal written policy provides no guidance regarding what constitutes excessive speed under the many different circumstances with which a driver could be confronted. Plaintiffs contend the definitive meaning of the phrase "excessive speed under the circumstances" actually is provided by policymakers, who ultimately establish the actual custom or practice of the Unified Government relative to vehicular speed in these circumstances. Plaintiffs contend it is this custom—as opposed to the formal written policy—that tacitly approves and/or explicitly endorses excessive speed under less than optimal traffic conditions.

In support of this contention, Plaintiffs submit the deposition testimony of Fire Chief DeKeyser, who denies the proposition that a speed of 50 miles per hour when Mots entered the negative right-of-way intersection at issue in this case necessarily would be inappropriate in any given situation. As Fire Chief, it is DeKeyser's responsibility to interpret and define the meaning of a department policy if such a policy comes into question. Based on the asserted conflict between the policy as written and the policy as interpreted by Fire Chief DeKeyser, and viewing the evidence in the light most favorable to Plaintiffs, the Court is persuaded that a material question of fact exists with regard to whether it is the practice and/or custom of the Unified Government to operate emergency response vehicles at unnecessary and excessive speeds under less than optimal traffic conditions.

*ii. Policy and/or Custom of Requiring that an Emergency Response Vehicle Approaching a Negative Right-of-Way Intersection Need Only Slow Down and Prepare to Stop*

Again viewing the evidence in the light most favorable to Plaintiffs, the Court accepts as true that Mots' fire truck had a red light as it approached and entered the intersection, and that Mots failed to stop the fire truck before entering this negative right-of-way intersection. Although written training materials utilized by the Unified Government instruct drivers to stop before entering a negative right-of-way intersection, Plaintiffs contend that Mots' failure to stop is consistent with the actual official policy and established custom of the Unified Government. In support of this contention, Plaintiffs cite to General Order 96, which requires that an emergency response vehicle approaching a negative right-of-way intersection only slow down and prepare to stop, as opposed to requiring the emergency vehicle to actually stop. Plaintiffs also cite to the testimony of

- Steven Jensen, the Kansas Highway Patrol Officer who provided some of the driver training to the Unified Government's fire department, including Mots, who states that the training he provided did not recommend that emergency vehicles be brought to a stop before entering a negative right-of-way intersection;
- Fire Chief DeKeyser, who stated that a driver/operator approaching a negative right-of-way intersection should follow General Order 96, which does not require an emergency vehicle to stop; and
- Mots, who stated he does not always stop at a red light and, in fact, that he usually does not stop at a red light.

For purposes of summary judgment, the Court finds the evidence presented by

Plaintiffs is sufficient for a jury to find Fire Department policy requires that an emergency response vehicle approaching a negative right-of-way intersection need only slow down and prepare to stop.

### iii. A Policy and/or Custom of Selecting Emergency Response Routes Using Only One Criteria: the Most Direct Route

Thomas DeKeyser, Fire Chief of the Kansas City, Kansas Fire Department, instructs that although factors such as traveling patterns and congestion, rush hour and the time of day in selecting a route to travel when responding to an emergency fire call may be considered, response time is the paramount consideration in selecting a route.

Mots always travels the most direct route when responding to an emergency fire call. Mots acknowledged that buildings at an intersection can blanket or redirect siren noise, and thereby increase the potential for a collision, that a busy and congested intersection is more prone to collisions involving emergency vehicles, and that the more intersecting roadways there are at an intersection, the more predisposed the intersection is to collisions. Nevertheless, even assuming that the features of the intersection make it more dangerous than another intersection, Mots always travels the most direct route when responding to an emergency fire call and does not change his chosen route to avoid an intersection that he believes is more hazardous.

Captain Stephen, who was Mots' supervisory captain and was seated to Mots' right at the time of the collision, would never avoid an intersection because he believed the intersection, due to congestion, traffic count, nature of signals, nature of road layout, or the presence of building structures, was more risky. To the contrary, he would still go through that intersection: "[c]losest route is what we like to go."

Simply put, the evidence presented is sufficient for a jury to find Fire Department policy and/or custom utilizes only one criteria to select emergency response routes: the most direct route.

### b. Deliberate Indifference To or Tacit Approval Of Such Misconduct by Municipality's Policymaking Officials After Notice to the Officials of the Particular Misconduct

To prove deliberate indifference, Plaintiffs are required to show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." [46] Inherent within this deliberate indifference standard is the requirement that municipal policymaking officials are aware that the custom—or particular misconduct alleged—is regularly practiced by municipal employees. In order to determine whether prior notice existed here, the Court finds it helpful to again sets forth the following customs and practices that Plaintiffs claim resulted in the constitutional deprivations alleged:

- A policy and/or custom of unnecessary and excessive speed in the operation of emergency response vehicles under less than optimal traffic conditions.
- A policy and/or custom requiring that an emergency response vehicle approaching a negative right-of-way intersection need only slow down and prepare to stop.
- A policy and/or custom of selecting emergency response routes using only one criteria: the most direct route.

---

**46.** *Bd. of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. at 411, 117 S.Ct. 1382.

Upon review of the evidence, the Court is persuaded that Plaintiffs sufficiently have carried their burden for purposes of surviving summary judgment. More specifically, the policies and/or customs referenced by Plaintiffs derive from, or are directly sanctioned by, Fire Chief DeKeyser in his capacity as the highest policymaking official within the Kansas City, Kansas Fire Department. As a preliminary matter, DeKeyser submits that the Fire Department, in certain circumstances, would sanction as appropriate the practice of traveling at a speed of 50 miles per hour, with a posted speed limit of 30 miles per hour, through a red light at a five-way intersection obstructed by buildings.

Moreover, DeKeyser states on behalf of the Fire Department that response time is the paramount consideration in selecting a travel route to a fire emergency. DeKeyser further states that although it is the driver's responsibility to determine an appropriate travel route in responding to an emergency call, the driver's supervisory captain riding in the fire truck retains final authority regarding this decision. To that end, both Mots—as a driver—and his supervisor, Captain Stephen, always travel the most direct route when responding to an emergency fire call and are not going to change this chosen route to avoid an intersection they feel is more hazardous.

Lastly, Fire Chief DeKeyser is aware of the requirements within General Order 96 (the official policy of the Fire Department) requiring a fire truck only to slow down and prepare to stop as it travels through a negative right-of-way intersection. Fire Chief DeKeyser is also aware that driver training materials provided to Fire Department employees instruct drivers to stop at negative right-of-way intersections, even if local policy or state statute does not require stopping. Confronted with this conflict, and acknowledging it is his responsibility as the top Fire Department policymaker to interpret and define the meaning of a department policy if such a policy comes into question, Fire Chief DeKeyser requires his employees to adhere to General Order 96 and relieves them of any duty to comply with the referenced training materials.

Based on the evidence presented, the Court is persuaded that municipal policymaking officials were aware of, and took no action to stop, Fire Department employees who regularly engaged in the practice of unnecessary and excessive speed in the operation of emergency response vehicles under less than optimal traffic conditions, who regularly complied with General Order 96 requiring only slowing down and preparing to stop upon approaching a negative right-of-way intersection, and who regularly selected emergency response routes using only one criteria: the most direct route. For this reason, the Court cannot rule out the possibility that a reasonable jury might find the municipality acted with deliberate indifference to the safety of those driving its roads.

### c. Causal Connection: Were Fire Department Customs and Practices the Moving Force Behind the Unconstitutional Acts?

In addition to culpability on the part of the municipality, there must be a direct causal link between the municipal policy and the constitutional deprivation. The United States Supreme Court describes this high threshold of proof by stating that the policy must be the "moving force" behind the injury alleged.[47] Ap-

---

47. *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see, also, City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

plying the threshold here, Plaintiffs must come forward with sufficient evidence from which a jury could find that Fire Department customs regarding excessive speed under less than optimal traffic conditions, only slowing and preparing to stop at negative right-of-way intersections and route selection using response time as a sole criteria, were the "moving force" behind the fatal car accident killing Becerra.

The Court is persuaded that Plaintiffs again have satisfied their burden. More specifically, the Court finds Plaintiffs have come forward with sufficient evidence for a jury to find that Fire Department customs and practices—to which Mots adhered—were the moving force behind the fatal car accident killing Becerra.

### 2. *Municipal Liability Based on Inadequate Training and/or Supervision*

 "[M]unicipal liability based on a policy of inadequate training requires proof of the municipality's 'deliberate indifference' to its inhabitants—i.e., the failure to train must reflect a deliberate or conscious choice by a municipality." [48] Plaintiffs may sufficiently demonstrate deliberate indifference by establishing that "the municipality [had] actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." [49] "In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." [50]

To support their claim of inadequate training, Plaintiffs submit professional training materials utilized by the Unified Government and compare them to official policies and established customs of the Fire Department. First, Plaintiffs note that all of these training materials consistently state in one way or another that the driver/operator of an emergency response vehicle should stop before entering a negative right-of-way intersection, regardless of a local policy or state statute to the contrary. In deposition testimony, Fire Chief DeKeyser readily acknowledges on behalf of the Fire Department a significant difference between the written training materials and the official policy of the Fire Department, which does not require drivers to stop at negative right-of-way intersections. Fire Chief DeKeyser instructs his drivers to follow official policy, not the training materials. Consistent with this testimony, the Fire Department's trainer—Mr. Jensen—deems the training materials incorrect, and instructs drivers they are not required to stop before entering negative right-of-way intersections.

Plaintiff also submit written training materials utilized by the Fire Department that state response route selection should take into account avoidance of hazardous intersections, including intersections which, due to numerous intersecting roadways, high traffic congestion and building structures, predispose to collisions. Notwithstanding these materials, Fire Chief DeKeyser states on behalf of the Fire Department that regardless of potential traffic hazards, speed of response is the paramount consideration in selecting a travel route in responding to a fire emergency. Consistent with DeKeyser's charge, both Mots and his immediate supervisor, Captain Stephen, will not avoid or route around an intersection just because it may be hazardous.

---

**48.** *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1998).

**49.** *Id.*

**50.** *Id.* at 1307 n. 5.

The training materials recommend that fire departments establish clear speed requirements for emergency vehicle operation under varying circumstances, thereby removing operator discretion. Nevertheless, the fire department does not have any specific speed limits for its emergency response vehicles. In his deposition, Fire Chief DeKeyser states he was unwilling to embrace the suggestion that even a speed of 50 miles per hour by Mots (with a posted speed limit of 30 miles per hour at a five-way intersection against a red light with building obstruction) would have been inappropriate. Steve Jensen, the person who provided driver training to Mots, deems it impossible to identify reasonable versus unreasonable speeds for emergency vehicle operation because speed "is the last thing you are really concerned about as the emergency vehicle operator."

With regard to inadequate supervision, Plaintiffs submit evidence demonstrating the Unified Government's failure to adequately investigate and analyze its own history of collisions and near-misses involving its emergency vehicles. Plaintiffs argue thorough investigations of all vehicular collisions are critical in order to accurately determine the causes and prevent collisions in the future. Plaintiffs submit that when the Board convenes to review a vehicular collision, the events of the meeting are not recorded or transcribed; the driver under investigation may attend the meeting, but he is not required to attend; the Board never seeks the attendance and participation at the meeting of any other fire department personnel or members of the public who may be witnesses with relevant information; and the Board often does not even obtain the related police report. Plaintiffs argue that absent thorough investigation and valid conclusions regarding prior collisions, the Unified Government is necessarily unable to use prior collisions to appropriately supervise and discipline unacceptable behavior in the past and thus prevent recurrence in the future.

In addition to these general facts, Plaintiffs also argue that Mots' immediate supervision on the night of the collision was inadequate. His supervisor was Captain Stephen, who was seated in the fire truck to his right. As the supervising officer, Stephen was responsible for ultimate approval of the route selected by his driver and the manner in which his driver operated the vehicle along that route. If Captain Stephen took issue with any aspect of his driver's operation of the vehicle, including route selection, speed or the manner in which the driver approached or intended to navigate an intersection, he was required to take charge and correct the driver's behavior. On the night in question, Stephen never said anything to Mots about his route selection, his speed or the manner in which he approached or intended to enter the intersection at Central Avenue and 18th Street. From the time the fire truck entered the intersection through to time of impact, Captain Stephen was looking down at his map book.

The evidence offered by Plaintiffs as set forth above is sufficient to demonstrate Fire Chief DeKeyser, acting on behalf of the Unified Government, had notice of the alleged deficiencies in training and supervision of Fire Department employees and, despite the notice, consciously chose to disregard the risk of harm that could be caused by these potential defects in training and supervision. This Court cannot rule out the possibility that a reasonable jury might find from this evidence that the Unified Government consciously and deliberately excluded information in the course of training and supervising its employees that it knew could safeguard the citizens driving on its roads and protect them from danger. A failure to train and supervise firefighters on ways to avoid such tragic

events as the one that happened here certainly could result in a finding by the trier of fact that the Unified Government exhibited "deliberate indifference" under these circumstances.

Finally, the Court finds Plaintiffs present sufficient evidence for a jury to find that the fatal car accident killing Becerra occurred because of Fire Department customs and practices consciously permitting insufficient training and supervision. In sum, the evidence presented creates triable issues regarding the adequacy of the Unified Government's emergency vehicle operator training, and its causal connection to Mots' operation of the fire truck on the night in question.

### IV. *Conclusion*

For the reasons stated above, Defendants' Motion for Summary Judgment

(1) is granted with respect to

• the claims of Hector Becerra under the Kansas Wrongful Death Act;

• the claims of Sabrina and Hector Becerra (in his individual capacity) under the Kansas statute for survival of claims; and

• the claims of Sabrina Becerra and Hector Becerra (in his individual capacity) under 42 U.S.C. § 1983; and

(2) is denied in all other respects.

IT IS SO ORDERED.